IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GREGORY HEINLE,                          )
                                         )
            Plaintiff,                   )
                                         )
     -vs-                                )        Civil Action No. 09-803
                                         )
MICHAEL J. ASTRUE,                       )
COMMISSIONER OF SOCIAL SECURITY,         )
                                         )
            Defendant.                   )

## MEMORANDUM OPINION AND JUDGMENT ORDER

Gary L. Lancaster,
Chief District Judge.                                    April 16 , 2010

This is an appeal from the final decision of the Commissioner of Social Security denying plaintiff's claim for Disability Insurance Benefits under Title II of the Social Security Act. Jurisdiction is proper pursuant to 42 U.S.C. § 405 (g). Plaintiff, Gregory Heinle, alleges that the Administrative Law Judge's ("ALJ") decision that he was not disabled, and therefore not entitled to disability insurance benefits for the period between July 28, 1987 and December 31, 1993, should be reversed or in the alternative remanded because the ALJ improperly disregarded the retrospective medical opinion of plaintiff's treating psychologist, improperly determined that plaintiff's post traumatic stress disorder (PTSD) and/or depression were not a severe impairments for the period at issue, and improperly failed to afford the opinions of two of plaintiff's treating physicians great weight. For the reasons that follow the Court will vacate the ALJ's decision and remand this case to the Commissioner for further evaluation.

I.     **Factual History**

Plaintiff was born on November 9, 1950 and served in combat during the Vietnam War from 1970 to 1971. (R. 26, 72, 86). In late December 1976, plaintiff was hospitalized with an acute onset of severe upper abdominal pain which radiated to the right side of the abdomen and

right leg which caused difficulty ambulating. (R. 110). Plaintiff reported numbness in his right leg. *Id*. Hospital notes recorded that he was "very depressed" and testing revealed positive straight leg raises, weakness of the dorsiflexion of the right foot, weakness of the peroneals, and weakness of the gastroenemlus with questionable Babinski signs. *Id*. Later testing revealed a spinal arteriovenous (AV) malformation.[1] (R. 112-113). Plaintiff began to experience paralysis from the chest down. (R. 105, 100, 119). On March 15, 1977, after being transferred to the Oakland Veteran's Hospital, plaintiff underwent a new microscopic procedure that involved a twelve hour long surgical excision of the malformation. (R. 105, 110-111). Plaintiff was discharged from the hospital in early July 1977. (R. 137).

At a follow-up appointment on July 13, 1977, Dr. Richard Wilson, a physiatrist, reported that plaintiff, at one point, had no motor or sensory perception below T-7 to T-9, but had regained some control of his bladder to the point where he could hold his urine for five minutes after feeling the urge to go. (R. 137). His upper extremities were intact, and he was capable of walking with a spastic style gait, but bilateral clonus was also present. *Id*. Plaintiff was noted as being "understandably" bitter and depressed and "quite disgusted" with his situation. Plaintiff was referred to the Bureau of Vocational Rehabilitation and YMCA for physical therapy and re-training. *Id*. This process took two years, at which time Plaintiff successfully returned to work at a steel mill, at times lifting more than fifty pounds. (R. 119-20, 136, 428-30).

On September 7, 1983, plaintiff was seen by Dr. Wilson due to an increase in his symptoms and spasticity. (R. 136). In the month prior to the examination, plaintiff was unable to work and had experienced frequent falling and continuing difficulty controlling his urination. *Id*. Examination revealed a spastic style gait with eversion of the right foot and a stiff knee on the right. *Id*. Electrical nerve studies were normal. Dr. Wilson noted his impression as spastic paraparesis secondary to vascular insufficiency and venous malformation at the level T11-T12.

---

[1] Arteriovenous malformations (AVMs) are defects of the circulatory system that are generally believed to arise during embryonic or fetal development or soon after birth. They are comprised of snarled tangles of arteries and veins. Arteries carry oxygen-rich blood away from the heart to the body's cells; veins return oxygen-depleted blood to the lungs and heart. The absence of capillaries—small blood vessels that connect arteries to veins—creates a short-cut for blood to pass directly from arteries to veins. The presence of an AVM disrupts this vital cyclical process. Although AVMs can develop in many different sites, those located in the brain or spinal cord—the two parts of the central nervous system—can have especially widespread effects on the body. National Institute of Neurological Disorders and Stroke, "Arteriovenous malformations," available at: http://www.ninds.nih.gov/disorders/avms/detail_avms.htm (last visited April 9, 2010).

*Id.* Antispasmocity drugs were recommended, but plaintiff rejected them. Valium was discussed, but Dr. Wilson noted that since Plaintiff was "coming off a legitimate depressive reaction," he wanted to cut that prescription entirely. Instead, a muscle re-education program and gait training were suggested. *Id.*

Plaintiff was examined by a doctor at the Veteran's Administration Hospital on August 22, 1985 with complaints of leg pain, twitching of the muscles, significant pain in the dorsal lumbar area, increased muscle weakness, and continuing bladder problems. (R. 114). The doctor noted that plaintiff was able to walk fairly well but still had some pronounced spasticity in the right leg. On examination, the doctor reported that Plaintiff had some sensory loss up to the level of T8 on the right leg, a stiff left side, hyperactive reflexes on both sides with no clonus, and right-sided Babinski signs. The doctor noted that the symptoms suggested lumbosacral strain and placed plaintiff on two weeks bed rest with Flexeril. *Id.* On September 1, 1985, plaintiff returned to the VA and reported that he was feeling better with rest and Flexeril. The doctor noted that the muscle twitching was much improved and that neck spasms persisted but had improved. Plaintiff was concerned about returning to his job due to lifting 70-100 pounds a total of five times per day. He was advised to see Dr. Wilson for a disability evaluation. *Id.*

In late July of 1987, plaintiff fell over backwards while at work and landed against some metal rails striking his buttocks and back. (R. 120). On August 11, 1987, Dr. Michael Miller evaluated plaintiff for related severe spasms in the back radiating down to the foot. (R. 115). Dr. Miller also noticed that plaintiff's toes were clawing with the dorsal aspect of the toes rubbing and noted plaintiff's chronic bladder dysfunction from the prior surgery. *Id.* Upon examination, spinous spasms were present in the back as well as the lower aspect of the legs. In addition, straight leg raises elicited pain in the right heel, reflexes were hyperactive at +4 on the right knee and ankle and +3/4 on the left side, weakness was present in the extensor hallucis longus and right quad, and the loss of one-half inch of thigh and calf circumference was present on the right. X-rays of the lumbosacral spine were essentially normal. *Id.* He was prescribed a Medrol dose pack and sent for an evaluation by a specialist. *Id.*

On August 26, 1987, Dr. Michael Casey, an orthopaedic surgeon, evaluated plaintiff for increased low back pain down the right leg. (R. 117). Dr. Casey noted spasticity in both lower extremities, right greater than left; weakness of the right anterior tibia and extensor hallucis

3

longus; clonus present on both sides, right greater than left; and past history of A-V malformation excision. *Id.* X-rays of the lumbar and thoracic spine were within normal limits but for the wide laminectomy at multiple levels from the previous surgery. He opined that the recent pain was likely a result of strain, but referred him to Dr. Elliot Michel, a neurologist, to rule out progressive problems. *Id.*

Plaintiff was evaluated by Dr. Michel on September 4, 1987 due to his low back twisting and falling injuries. (R. 119). Plaintiff reported that the was experiencing pain, cramps and spasticity in his right side since his surgery, but that his condition had markedly deteriorated over the previous five years. He also reported that he had begun to experience leg spasms at night and flexor spasms and decreased strength in both the left and right legs. Dr. Michel noted that plaintiff was on worker's compensation for his recent injury. *Id.* On examination, plaintiff had a spastic gait to the right, reflexes were hyperflexic bilaterally, two to three beats of unsustained clonus were present on the right, plantar responses were extensor (positive Babinski sign), proprioception was spared, vibration sensation was decreased on the right and intact on the left, and some increased urinary urgency was noted. *Id.* An MRI of the thoracolumbar spine was suggested to rule out recurrent AVM and central lumbar disc problems. Plaintiff was prescribed Lioresal, an anti-spasmodic drug. *Id.*

On December 21, 1987, plaintiff was examined by Dr. Wilson for a rehabilitation evaluation. Dr. Wilson reported that plaintiff had been a spastic paraplegic since 1977 and had originally been completely bladder and bowel incontinent, but now was experiencing marked urinary urgency with nocturnal incontinency. (R. 138-139). Plaintiff was also experiencing bowel incontinencies about twice per month. Dr. Wilson noted that plaintiff was using an external catheter at work. *Id.* Plaintiff reported that he was in chronic pain, was only able to stand for about a half an hour, had difficulty walking a block and a half due to his spasticity, and was experiencing difficulty ambulating. *Id.* Plaintiff also reported that he drank, on average, a six pack, and a couple of shots of whiskey at night. Upon examination, Dr. Wilson reported definite spastic paraparesis with a hemitype parapetic gait with some scissoring and stiffness in the leg. Examination of plaintiff's shoes revealed that the right toe was completely worn out just at the tip of the toe, which was also present on the left, but not as pronounced. Plaintiff also had bilateral clonus present at the ankles, interrupted knee clonus on the left, almost sustained clonus

4

on the right, cremasteric reflex on the left, limited range of motion in the ankles due to spasticity, neutral dorsiflexion of the foot on the right, twenty degrees of dorsiflexion on the left, and some genu retrovatum on the right. *Id.* Dr. Wilson also reported that a cord level was present on the right at about T6 with diminished abdominal reflexes. Dr. Wilson opined that plaintiff should "at least apply" for social security benefits and referred him to Harmarville rehabilitation for evaluation. *Id.*

On January 4, 1988, Dr. Michel composed a letter to a workers' compensation insurance claims adjuster indicating that plaintiff was suffering from myelopathy of the spinal cord secondary to prior AV malformation. (R. 118). He noted that this problem was chronic. Dr. Michel reported that plaintiff's ability to work, at that time, was "somewhat questionable" and suggested that he was awaiting Dr. Wilson's assessment of that possibility. *Id.*

Plaintiff was evaluated by Dr. Richard Weisman, a neurologist, on September 20, 1988. Plaintiff reported that his work injury had resulted in persistent pain over the low back with radiation into both lower extremities. (R. 120-121). Dr. Weisman noted that plaintiff had been offered an inpatient program, but was reluctant to get involved with it due to strong feelings against an inpatient program. Dr. Weisman opined that while plaintiff had accepted his deficit, he appeared to be manifesting depressive behavior including heavy drinking and statements that he did not know what to do with the rest of his life. *Id.* Plaintiff reported constant pain over his back with times of more painful spasms, pain radiating down both legs, numbness and weakness in the legs, urinary urgency and frequency with occasional incontinence, rare stool incontinence, and problems with gait. *Id.* Plaintiff noted that he did not use assistive devices. *Id.*

On examination, Dr. Weisman reported that plaintiff "clearly appear[ed] to be depressed" with tenderness over the thoracolumbar spine, markedly increased tone in both lower extremities with spasticity, markedly hyperactive reflexes, bilateral ankle clonus and Babinski signs, weakness in both lower extremities, stiff-legged gait, hypalgesia of the right lower extremity, impaired vibration sense on the right, and very painful straight leg raising at thirty degrees. *Id.* Dr. Weisman noted that plaintiff's neurological examination was remarkable for spastic paraparesis, right greater than left and some element of radiculopathy. He also reported that plaintiff was not a good candidate for additional surgery and that his condition would likely deteriorate due to degeneration of previously injured nerve pathways. *Id.* Dr. Weisman

5

recommended a rehabilitation program in Harmarville where plaintiff could receive psychological counseling, pain management, physical and occupational therapy, and vocational training. He also prescribed Lioresal, which he noted plaintiff had previously failed to take. *Id.*

On November 7, 1988, plaintiff was evaluated for a pain program at Harmarville Rehabilitation by Dr. John Delaney. (R. 123-125). Dr. Delaney reported that plaintiff had been referred to various rehabilitation programs in the past and had been prescribed medication, but did not want to participate in a rehabilitation program and did not like to take medication. He also noted that there was some question as to whether plaintiff had an alcohol related problem. A neurological examination revealed that plaintiff was "more than moderately depressed" with a spastic gait, weakness in both lower extremities, a T4 sensory level both anteriorly and posteriorly, a degree of hyperalgesia on the right lower extremity, impaired straight leg raising to forty degrees bilaterally, extremely active reflexes, evidence of knee and ankle clonus, spontaneously up-going toes, and atrophy in both lower extremities suggestive of cord compression. *Id.* Dr. Delaney noted his impression as arteriovenous malformation of the thoracic cord, spastic paraparesis, neurogenic bowel and bladder, and depression, moderate. He suggested that he could not understand how "this man functioned in his job capacity with this degree of paraparesis." He suggested an inpatient rehabilitation program and treatment for depression. *Id.*

The pain management team at Harmarville completed a conference report on November 11, 1988. (R. 122). Dr. Delaney's findings were noted. Suggestions from a psychologist, vocational rehabilitation counselor, and occupational therapist were also noted. The psychologist noted that plaintiff was "definitely depressed" and would require inpatient treatment for his reported alcohol abuse. The vocational rehabilitation counselor noted that plaintiff did not have alternative vocational goals and that it would be beneficial to develop such goals. The occupational therapist recommended a comprehensive chronic pain management program. Overall, the recommendation was to admit to inpatient "with the understanding that return to work classification of heavy was not a viable goal." *Id.*

Plaintiff did not treat for any of his ailments between late 1988 and his date last insured of December 31, 1993. Beginning in 1995, plaintiff began treating with the VA for various issues. At some point during this treatment, he was diagnosed with posttraumatic stress disorder (PTSD) stemming from his service in Vietnam. (R. 404-405). In August 1999, plaintiff settled

his worker's compensation claim for a lump sum. (R. 60-70). Plaintiff also was approved for a fifty percent VA disability benefit for PTSD in 1995, which was later increased to one hundred percent. (R. 431-432).

## II. Procedural History

Plaintiff protectively filed an application for disability insurance benefits on December 5, 2005. (R. 75). Plaintiff alleged disability beginning July 28, 1987. (R. 72). Plaintiff's date last insured (DLI) under the Act was December 31, 1993. (R. 72, 86). Therefore to be eligible for disability insurance benefits, he had to prove that he was disabled during the period between those dates. 42 U.S.C. § 423 (a), (c). After plaintiff's initial claim was denied, a hearing was held before the ALJ. (R. 423-429). Plaintiff, who was represented by counsel, and Charles Cohen, Ph.D., an impartial vocational expert (VE) testified at the hearing on August 17, 2007. *Id.* On December 18, 2007, the ALJ found that plaintiff was not disabled. (R. 17-28). Plaintiff submitted additional evidence to the Appeals Council, but the Appeals Council found no basis for reviewing the ALJ's decision and denied plaintiff's request for review on February 19, 2009. (R. 9-12). After thus exhausting his administrative remedies, plaintiff commenced this action against the Commissioner pursuant to 42 U.S.C. § 405 (g).

When resolving the issue of whether a claimant is disabled and whether a claimant is entitled to DIB benefits, the Social Security Administration applies a five step analysis. 20 C.F.R. § 404.1520 (a). The ALJ must determine: (1) whether the claimant is currently engaging in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if the claimant has a severe impairment whether it meets or equals the criteria listed in 20 C.F.R. pt. 404. subpt. P, app. 1; (4) if the impairment does not satisfy one of the impairment listings, whether the claimant's impairments prevent him from performing her past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy, in light of his age, education, work experience and residual functional capacity. 20 C.F.R. § 404.1520. In all but the final step, the burden of proof is on the claimant. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).

In this case, the ALJ determined that plaintiff was not disabled at the fifth step of the sequential evaluation process. (R. 17-28). He concluded that plaintiff suffered from spinal stenosis, spastic paraparesis, and congenital arteriovenous malformation, which were deemed to

7

be a combination of severe impairments under 20 C.F.R. §§ 404.1520 (c). (R. 19). The ALJ

determined, however, that these impairments did not meet or medically equal an impairment

listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 20). The ALJ concluded that plaintiff was

unable to perform any past relevant work. (R. 26). Furthermore, he determined that plaintiff

could perform a full range of sedentary work, and that jobs falling within the confines of his

residual functional capacity existed in significant numbers in the national economy. (R. 21-27).

As a result, he concluded that plaintiff was not under a disability at any time from July 28, 1987

and December 31, 1993, the date last insured. (R. 27).

**III. Analysis**

In support of his motion for summary judgment, plaintiff makes several arguments.

First, he argues that the ALJ erred at step two by failing to find that plaintiff's depression/PTSD

was a severe impairment. (Br. for Plaintiff at 14-16). Second, he contends that the ALJ failed to

consider the retrospective opinion of plaintiff's treating psychiatrist, Dr. Joseph Fetchko. ( Id. at

17-22). Finally, plaintiff claims that the ALJ improperly rejected the opinions of Dr. Wilson and

Dr. Weisman regarding complications from his work injury and AV malformation. (Id. at 22-

24). The Court will proceed to address each argument.

### Records of Dr. Wilson and Dr. Weisman

Plaintiff also argues that the records of Dr. Wilson, plaintiff's treating physiatrist, and Dr.

Weisman, an evaluating neurologist, established disability based on his physical impairments

and were unopposed by any contrary medical evidence. Plaintiff suggests that these reports

should have been given great weight and were rejected based on the ALJ "blindly ignor[ing] the

supporting medical evidence." (Pl. Brief at 24).

A cardinal principle guiding disability eligibility determinations is that the ALJ accord

treating physicians' reports great weight, especially when their opinions reflect expert judgment

based on a continuing observation of the patient's condition over a prolonged period of time."

*Morales v. Apfel*, 225 F.3d 422, 429 (3d. Cir. 1999), quoting, *Plummer v. Apfel*, 186 F.3d 422,

429 (3d Cir. 1999). However, for controlling weight to be given to the opinion of a treating

physician that opinion must be "well supported by medically acceptable clinical and laboratory

diagnostic techniques and [ ] not inconsistent with other substantial evidence." 20 C.F.R.

§§404.1527 (d)(2), 416.972 (d)(2).  An ALJ may reject a treating physician's opinion outright on

8

the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. *Newhouse v. Heckler,* 753 F.2d 283, 286 (3d Cir.1985). There are several factors that the ALJ may consider when determining what weight to give the opinion of the treating physician. 20 C.F.R. §404.1527, 416.927 (d)(2). They include the examining relationship, treating relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory signs, consistency, specialization, and other factors. 20 C.F.R. §404.1527 (d), 416.927 (d).

Generally, an ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. *Fargnoli v. Massanari ,* 247 F.3d 34, 37 (3d Cir. 2001). When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must consider all the evidence and give some reason for discounting the evidence he rejects. *Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983).

The medical records reveal that plaintiff experienced significant difficulties after his 1977 surgery for AV malformation. Plaintiff continually exhibited a spastic gait and bladder difficulties. He recurrently, starting with notations in his 1985 records, exhibited sensory loss to various levels of his thoracic spine, hyperactivity of the reflexes, clonus and positive Babinski signs. None of the doctors that examined plaintiff beginning in 1987 differed on their findings relating to the significant issues that were a result of the 1977 AV malformation microsurgery.

Through July 28, 1987 and despite many of these difficulties, plaintiff was capable of work at a heavy level. He reported that his work involved lifting 70-100 pounds a total of five times a day per day. (R. 114). It is evident from the records that his doctors had difficulty discerning the impact of his July 1987 injury on his pre-existing problems. Attempts were made to treat plaintiff with antispasmodic medications and through rehabilitation, however, plaintiff did not take the prescribed medications and had "strong feelings" against an inpatient program. Dr. Wilson suggested that plaintiff "at least apply" for social security benefits, but also referred him to Harmarville Rehabilitation for evaluation. Dr. Weisman opined that plaintiff's condition would likely deteriorate due to continuing difficulties due to his pre-existing condition, but also

9

recommended inpatient treatment at Harmarville for psychological counseling, pain management, physical and occupational therapy, and vocational training. Dr. Delaney recommended a similar course of treatment. All of these doctors agreed that plaintiff could not return to his prior heavy work, however, they refrained from opining on whether he was capable of other work, or, in general, the extent of his capabilities. Dr. Delaney suggested that the rehabilitation program should be undertaken "with the understanding that return to work classification of heavy was not a viable goal." The actual goal of the program or the likelihood of success, however, was not particularly clear.

The ALJ discussed all of these records, and even went so far as to discuss plaintiff's treatment records from after his date last insured. The difficulty in formulating a functional capacity based on the medical documentation from the period between July 1987 and December 1993 is evident. Plaintiff only underwent examination by physicians from August 1987 through November 1988, rejected treatment, and then received no treatment for a significant period. In the records that do exist, there was consensus that plaintiff could not return to his prior heavy work, but no formal opinion was given as to whether there was work that he could perform, although there is a strong inference from the record that the physicians believed he could in some way be occupationally rehabilitated.

In attempting to resolve this issue, the ALJ relied heavily on an independent medical examination performed on December 4, 1998 by Dr. Marc Adelsheimer, which was completed secondary to plaintiff's worker's compensation claim for the July 28, 1987 fall. (R. 129-133). Dr. Adelsheimer opined that by the date of the examination, plaintiff's lumbosacral sprain secondary to his work fall had resolved, but that he would have "severe difficulty returning to gainful employment" due to non-work related problems including his spastic paraparesis and post-traumatic stress disorder. Dr. Aldelsheimer released plaintiff to sedentary work secondary to these difficulties. *Id.* Despite the ALJ's heavy reliance on this report, the report itself does not speak to plaintiff's disability during the period at issue. It is evident that Dr. Adelsheimer believed that plaintiff's lumbosacral sprain stemming from the July 28, 1987 incident had resolved by December 4, 1998; however, no opinion was given as to his ability to work in the period just subsequent to that accident. It is evident that the "great weight" afforded this report was misplaced. Since the medical record does not provide significant detail on plaintiff's

10

capabilities during the period at issue, but does record significant symptomology, remand is necessary for reconsideration of the issue.

The ALJ acknowledged the difficulties stemming from this case due to the age of the documentation and the relatively confined period for which plaintiff claims disability. The only question posed to the ALJ was whether plaintiff's impairments rendered him disabled, as defined under the Social Security Act, from between July 28, 1987 and December 31, 1993. Although it was acknowledged that plaintiff had no treatment records between November 1988 to 1995, it is impossible to tell, based on the decision at hand, where support for the assessed residual functional capacity existed with respect to actual medical documentation. The only independent medical examination and report of record gave no opinion on plaintiff's capabilities during the relevant period, as the report only suggests that plaintiff's lumbosacral sprain had resolved by 1999. Since this was the main piece of evidence relied upon by the ALJ in making his determination, the decision is not supported by substantial evidence. It is evident that additional record building may be necessary on remand in order to adequately determine plaintiff's capabilities for the relevant period.

### Dr. Fetchko's Retroactive Diagnosis and Mental Health Records

Plaintiff alleges that the ALJ erred in not accepting the opinions of Dr. Fetchko[2] in finding that plaintiff's depression/PTSD was not a severe impairment. Specifically, plaintiff argues that his mental conditions were "more than 'minimal' impairments." (Br. for Plaintiff, p. 16). In making his findings relating to the severity of plaintiff's mental impairments, the ALJ engaged in the following discussion:

---

[2] On April 26, 2006, Dr. Fetchko composed a letter indicating that plaintiff had been in treatment at the VA since 1995 and was considered one hundred percent disabled by the VA due to PTSD stemming from the Vietnam War. (R. 404). Dr. Fetchko opined that plaintiff had experienced "difficulties related to his time in the service going back to shortly after his return home from his combat duty."*Id.* Dr. Fetchko based this opinion on a review of plaintiff's medical records (as discussed above) dating back to the 1970s and on a letter composed by one of plaintiff's past work supervisors noting that plaintiff was argumentative, sometimes combative, preferred to work by himself, and failed to get along with other employees. Dr. Fetchko stated, "[g]iven these observations and the natural course of PTSD; it is likely that this was an added factor [to] the veteran['s] problems going back prior to his first presentation at the Veteran's Administration for treatment in 1995. The PTSD is likely to be compounded by his various medication problems. It is not unusual for someone to present for the treatment of PTSD long after the symptoms first appear." *Id.* In conclusion, Dr. Fetchko opined that it was "highly likely" that plaintiff was suffering from clinical PTSD during the time at issue in this case. He suggested that an individual unfamiliar with PTSD would likely describe the problem as "depression." He noted that PTSD was not added into the Diagnostic and Statistical Manual utilized by mental health treaters until 1980. *Id.*

11

> I find that prior to 1995, the claimant did not have a severe mental impairment. His treating and examining physicians noted the claimant's complaint of more depressive type symptoms and post traumatic stress disorder, but there is no showing that the claimant could not have perform[ed] simple duties that required little or no judgment and could be learned in a short time, which constitutes our definition of unskilled work (20 CFR 404.1568(a)). The claimant testified he has been receiving VA benefits since 1995 for post traumatic stress disorder ... but the record does not reflect severe mental impairment prior to 1995. Various doctors who examined the claimant during the relevant period recommended a comprehensive pain management program for a more active degree of physical therapy and active use of antispasmodic drugs and to address alternative vocational plans. It was felt that he would also benefit from the program for complaints of depression, post traumatic stress disorder counseling, and for the use of alcohol ... There is no evidence that plaintiff was incapable of unskilled work, as the term is defined in 20 CFR 404.1568(a).

(R. 20). He did not discuss Dr. Fetchko's letter in the step two analysis and instead, rejected it later in his examination of residual functional capacity.[3]

At step two of the sequential evaluation process, the ALJ must determine whether a claimant's impairment is "severe" as defined in the Act. 20 C.F.R. § 404.1520(a)(4)(ii). The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe." *Newell v. Commissioner of Social Security,* 347 P.3d 541, 546 (3d Cir.2003), *citing, Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996). "[An] impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Importantly, the step two inquiry is a *de minimus* screening device and, if the evidence presents more than a slight abnormality, the step two requirement of severity is met and

---

[3] With respect to Dr. Fetchko's letter, the ALJ stated, "I have considered the letter by Mr. Remaley regarding recent VA records that include a statement by the claimant's psychiatrist, Dr. Fetchko, relating to the claimant's severe psychological disability back to at least 1988 when he was evaluated by several doctors who noted "clear" evidence of depression related to his service related activities ... The written medical record for this or any other emotional condition is scanty during the relevant period, and does not document symptoms severe or prolonged enough to prevent sustained work. The claimant did not require other than conservative treatment, and the evidence (prior to 1995) does not show an exacerbation of his symptoms during the relevant period that persisted long enough to prevent sustained work." (R. 26).

the sequential evaluation process should continue. *Newell,* 347 F.3d at 546. "Reasonable doubts on severity are to be resolved in favor of the claimant." *Id.* at 547; *see also McCrea v. Commissioner of Social Security,* 370 F.3d 357, 360 (3d Cir.2004) (stating that the burden placed on a social security claimant at step two is not an exacting one and holding that any doubt as to whether a claimant has made a step two severity showing is to be resolved in favor of the claimant).

Notably, the ALJ did not make the disability determination at step two. He went on to analyze Dr. Fetchko's letter regarding a retrospective PTSD diagnosis and medical records from the relevant period as part of his step five analysis. Plaintiff generally argues that plaintiff's mental impairments stemming to the period at issue, whether PTSD or depression, had more than a minimal impact on his ability to function and significantly contributed to his alleged disability. A general review of case law, in this Circuit and others, regarding the issue of retrospective PTSD diagnoses and opinions of disability suggests that contemporaneous documentation of relevant symptomology[4], whether medical or lay evidence, must be present for such a diagnoses to be utilized as an acceptable source opinion. *See Small v. Commissioner of Social Security,* 60 Fed. Appx. 919, 922 (3d Cir. 2003)(record was devoid of testimony by relatives, co-workers, or other sources and of medical evidence to corroborate the physician's retrospective diagnosis of PTSD); *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002)(where conflicting evidence regarding a retrospective diagnosis of PTSD exists, the ALJ

---

[4] The Diagnostic and Statistical Manual for Mental Disorders (DSM-IV-TR) sets forth criteria for a diagnosis of PTSD including exposure to a traumatic event (meeting two criteria: person has experienced, witnessed, or been confronted with an event or events that involve actual or threatened death or serious injury, or a threat to the physical integrity of oneself or others and person's response involved intense fear, helplessness, or horror) and symptoms from three categories: intrusive recollection (person's response involved intense fear, helplessness, or horror; recurrent distressing dreams of the event; acting or feeling as if the traumatic event were recurring; intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event; and physiologic reactivity upon exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event); avoidant/numbing (efforts to avoid thoughts, feelings, or conversations associated with the trauma; efforts to avoid activities, places, or people that arouse recollections of the trauma; inability to recall an important aspect of the trauma; markedly diminished interest or participation in significant activities; feeling of detachment or estrangement from others; restricted range of affect; and sense of foreshortened future); and hyper-arousal (difficulty falling or staying asleep; irritability or outbursts of anger; difficulty concentrating; hyper-vigilance; and exaggerated startle response). The duration of the disturbance must be more than one month. American Psychiatric Association, *Diagnostic and statistical manual of mental disorders DSM-IV-TR* ( Fourth Ed. 2000).

can determine which evidence to credit); *Allord v. Barnhart*, 455 F.3d 818 (7th Cir. 2006)(contemporaneous corroboration, in the form of medical or lay evidence, can be utilized to support a retrospective diagnosis of PTSD); *Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995)(where the ALJ failed to discuss corroborating evidence from relatives that supported a retrospective diagnosis of PTSD, the decision was not supported by substantial evidence); *Adame v. Apfel*, 4 Fed. Appx. 730 (10th Cir. 2001)(where the opinion of a treating physician regarding a retrospective diagnosis of PTSD is speculative, conclusory, or without supporting evidence, the ALJ need not accept that an individual suffered disabling effects of the impairment during the relevant period).

Dr. Fetchko opined that PTSD was "likely" a problem stemming back to the period before plaintiff presented to the VA in 1995. This statement is far from conclusive on the issue of when or if plaintiff manifested PTSD symptoms that were significant or severe. Plaintiff's doctors noted depressive symptoms but were non-specific about the extent or type of these symptoms. In addition, Dr. Fetchko never opined that PTSD caused or contributed to plaintiff being unable to function during the relevant period, only that it was "was an added factor [to] the veteran['s] problems." (R. 404). The first mention of depression came in plaintiff's post-operative records. In July of 1977, Dr. Wilson noted that plaintiff was "understandably" bitter and depressed and "quite disgusted" with his post-operative situation. (R. 137). It was next noted in September 1983 when Dr. Wilson stated that he was taking plaintiff off Valium due to a "legitimate depressive reaction." (R. 136). Records obviously show that plaintiff worked throughout the period from 1979 to July 1987. In September 1988, Dr. Weisman opined that plaintiff was manifesting depressive behavior, which included heavy drinking and statements that he did not know what to do with the rest of his life. (R. 120-121). He noted that plaintiff "clearly appeare[ed] to be depressed" and recommended psychological counseling. *Id.* This recommendation was seconded by Dr. Delaney at Harmarville Rehabilitation in November 1988, who noted that plaintiff was "more than moderately depressed." (R. 123-125). The pain management team report from Harmarville also recommended psychological treatment as part of a comprehensive inpatient program. (R.122). Plaintiff received no mental health treatment following this evaluation until he began treating with the VA in 1995.

14

Dr. Fetchko opined, in his letter written in conjunction with the administrative level process, that an individual unfamiliar with PTSD "would likely describe" the problem as depression. It is unclear from the records whether plaintiff's treating or consulting doctors from the period were familiar with PTSD or its symptoms. None of the individuals that examined plaintiff were psychologists. Dr. Fetchko, however, did not opine with any degree of certainty whether these individuals were making an improper diagnosis of plaintiff's mental ailments because specific, contemporaneous symptoms were not noted in 1987 and 1988. It is, therefore, difficult to determine whether plaintiff was manifesting PTSD symptoms at that time. Dr. Fetchko also notably wrote that he was stating his opinions, due in part, to a letter from one of plaintiff's past supervisors. This letter, however, is not in the record and no timeline is noted for this information. Since the medical and lay documentation of PTSD symptomology is not evident from the record, it was not in error for the ALJ to reject opinions associated with Dr. Fetchko's unsupported diagnosis of PTSD for the period at issue and to find that PTSD was not a severe impairment.

The court does find, however, that the ALJ erred in not resolving the issue of depression as a severe impairment in favor of plaintiff. It is evident from the record that during September and November 1988 significant depression was noted in plaintiff's records and had also been documented prior to that time. More than a *de minimus* impact on plaintiff's ability to function was therefore evident in the record. Since this case is being remanded, it is unnecessary for the court to determine whether this error gave rise to a separate cause for remand. It is noted that the ALJ continued to step five and did give significant discussion of plaintiff's mental impairments. In light of the remand, however, this deficiency can be addressed.

## Conclusion

For the preceding reasons, this Court grants plaintiff's motion for summary judgment (Doc. No. 6) insomuch as it requests a remand for disposition of these issues not inconsistent with this opinion. As such, the Court vacates the decision of the ALJ as to plaintiff's application for benefits and remands for a decision consistent with this opinion.

15

Therefore, this 16th day of April, 2010, IT IS HEREBY ORDERED that plaintiff's motion for summary judgment [document #6] is GRANTED in part and DENIED in part. The decision of the ALJ is vacated as to plaintiff's applications for benefits and the case is remanded for a decision not inconsistent with this opinion. Defendant's motion for summary judgment [document #10] is DENIED.

BY THE COURT:

_____ , C. J.

cc:     All Counsel of Record

16